Jen Banford v. the Board of Regents of the University of Minnesota. Ms. Van Dyke, when you are ready, you may proceed. Ms. Van Dyke. Sorry. It's perfectly fine. May it please the court. My name is Sharon Van Dyke. I represent the appellant, Jennifer Banford. The issues in this case, which is a Title VII discrimination case, employment-related, basically narrowed down to the last two factors of the McConnell-Douglas test. The case was dismissed on summary judgment the second time around after the meaning of because of sex changed at the United States Supreme Court and overturned existing Eighth Circuit precedent. So at this point in time, the appeal is from whether or not Jen Banford can make a prima facie case and following that, demonstrate that she has, that there's a rationale, if you believe her inferences, there's a rationale that supports discriminatory conduct in the ending of her employment at UMD that is based because of her sex, be that gender or be that her homosexuality. The first two elements in the McConnell-Douglas test are conceded, which leaves us with the last two. With respect to the summary judgment dismissal, the court divided Ms. Banford's employment contract in two pieces and treated them differently and basically found that the third prong, whether or not she suffered an adverse employment action, was met with respect to her hockey duties. She had hockey duties, but she was primarily hired as a softball coach and she was the head softball coach at UMD. She had both types of duties. So with respect to the hockey piece, the court divided it and said yes, there is an adverse employment action because that was eliminated along with the 15,000 augmentation that paid for it and with respect to the, excuse me, with respect to her softball position, that the plaintiff lacked evidence to make a prima facie case of a discriminatory motive based on her sex and in addition to that, there was no adverse employment action because they offered her a softball position at a higher pay level. Both are wrong, but I think we have to start as our briefing did with the fact that it was error to treat her as if she had two jobs. Well, go ahead, you go ahead. Does it make a difference? I mean, everybody can see she suffered an adverse employment action. Whether or not it's 40% or 100% of her salary, it's adverse, right? I mean, I don't think that employees are disputing that. They certainly did blow because they offered her a new job. They offered her a softball position, it was a new job at a theoretically higher salary and therefore, there was no discrimination. So if you don't, therefore, she didn't lose anything even if there was discrimination. They're conceding she lost something on the hockey side of it, right? That's conceded. And so, yeah, and at the end of the day, what they're really saying is she was a softball coach and she was a softball coach before she was involved in hockey operations. Then she had the hockey operations added to her job, which really was, she was doing two jobs, getting paid separate amounts, identifiable on each contract, in a single contract, but each being a separate provision. And that the consideration of those separately is entirely logical because she proceeded as the softball coach, continued as the softball coach, and was offered a position as the softball coach. Now, as Judge Malloy says, doesn't matter at the end because there's an adverse employment action either way and so the analysis is still going to be, move on to the next step, right? So why was Judge Schultz wrong on that? I mean, because I get logically what he's saying. He's saying, you know, she was the coach, she continues as the coach, she was offered a position as the coach and she was always the coach. It's the hockey operations piece that moved around. And the money paid for each position was always separate, always looked different. I would beg to disagree to how you're characterizing the money piece because what she had was an augmentation. She had the augmentation before she was working in hockey. She had a part-time position just like all the other positions that, her softball was a nine-month-a-year job when she started and within a year or two, it was a 10-month-a-year job. But it was never a 12-month-a-year job in Division II athletics. And so basically, as a way to give people full-time employment and full-time benefits, which was a good thing, they assigned Division II hockey, not just softball coaches, but other similar Division II sports head coaches, assigned those people to do administrative duties. And they got paid some augmentation for whatever the heck those duties were. And those were assigned by the athletic director as a general rule. When she began, and it was $10,000, and it was like 10 years before the end of her tenure, she worked in all kinds of different areas. She worked in soccer. She worked in some basically administrative-type work. She was good at it. That's why she was offered the part-time hockey position, and it was presented to her as an administrative job, just like the others, her 25%. That's the way it worked at the time that she got it. It was never designated in her contracts as she was going forward. It was never designated to be, this is your payment for soccer this year, or this is your payment for being the game administrator for this sport, or any of these other jobs that she had. It was always, this is your augmentation, and we're gonna assign you something. When it got to hockey, it was a lot more work. It was higher visibility. She took it because it was, she saw it as a way to learn Division I sports. She was a young woman. She wanted to move up in the world, and she took it for those reasons, knowing it was gonna be a lot of work. She was, her compensation for that piece, and you're right to the degree that by the time she got to hockey, it was always associated with that piece, although there's some question about how exactly that worked in the books, but that's not really what we're talking about here, but by the time she got to hockey, it was clearly associated with that piece. It was $15,000. It was a flat thing. One of the errors that Judge Schultz made was in treating them as separate, is how he arrived at the conclusion, but the softball, she didn't suffer any discrimination at all because she made more money. The offer gave her more money for the base salary, but it took away the $15,000 guarantee, so that was also a discriminatory piece based on the softball piece, and she had no obligation to take something that lowered her total pay, and that's prong three, and that was clearly error. When you've got an employment contract, you really need to treat it as a contract, and he did not. He didn't, there's no discussion of the contract at all, or even the total history of how that little piece got put there, and that brings me to, okay, the evidence of discriminatory motive for the action. Judge Schultz said that the most common way to prove it is to find a comparator, a similarly situated comparator that is similarly situated in all pertinent respects, and your honors, they're really, he struggled, we've struggled, everybody's struggled, how do you find a duplicate comparator to Jen Banford's position? It's extremely difficult because none of the other head coaches, Division II, including Bob Rience, who is the baseball coach that Judge Schultz decided was the closest comparator to her, which might have been true if their salary structure had been the same, but it wasn't. Bob Rience, the record clearly reflects, in one of Josh Berlow's declarations, that he didn't have any kind of augmentation to his salary. His base salary was his total salary. Well, aside from the comparator, what's your best evidence of discrimination? The best evidence of discrimination is twofold. One is comments made by Josh Berlow that he's gonna bring her down to Bob Rience's level. There was no need, what does that mean? Why, why would he do that? He already had them in his head, he had already said those things about her, and this is in a department where there's a whole brouhaha going on about all these lesbian women, and they're getting rid of the head coach, and Jen Banford is the head coach's lesbian partner. That is the elephant in the room, because if you look at who was let go in the department, you've got all lesbian women, so how do you find any evidence of discrimination if you only get rid of four of them instead of all seven? That wouldn't have fit the rationale, which is staff, coaches, whether it was senior staff came at the very end of the tale. Nobody was talking about senior staff until an appellant's brief. If you look at the contemporary discussion about why, Jen Banford was included with the two coaches, hockey coaches that were let go with Shannon Miller, that was the coaching staff, there were three of them, not four. The term operations staff didn't appear until the original summary judgment motion in Josh Berlow's declaration, he uses that term in litigation. If you look at what he said before litigation, he described, in fact, in the letter, the clarification letter he gave her in January, right before the offer, he uses the words coaching staff and staff. He didn't use any of the words that would have put Jen Banford, who's a softball coach, not a hockey coach, not an athletic trainer knowledgeable in hockey, not a strength trainer knowledgeable in hockey, she's doing operations. She has a job description of head coach, she's got a job number as head coach, she has an administrative position, and she's treated like the hockey coaches. That's not the pretext, that is not, the business rationale doesn't fit for her. It simply does not fit. The coaching staff, at this point we concede and we did it below, that the coaching staff, there's precedence for the idea that in a division one team, even though we dispute that this has ever been done at UMD, because it's a division two school, it's the only sport, that's division one, certainly in division one schools you see it. And it's the hockey coaches, if it's hockey, it's the hockey coaches, it's the assistant coaches, it's everybody related to hockey, specifically the sport, the coaching mechanisms, that whole thing, they're subject to being let go. An administrative position, which this still was, she didn't have the job code associated with a full-time director of operations, ever. She was never given that, she was never given the pay that was associated with that position, she was always the softball coach. And so what we're left with is, why is she, out of the other three administrative type people who also have other jobs, why is she treated differently? And there's a huge dispute about who her supervisor was, but there shouldn't be. Head coaches report to the athletic director and the assistant athletic director, they don't report to another coach in another sport, ever, in that system. So, I'm basically out of time. Thank you for your attention. We'll reverse, we request that you reverse and remand for trial. Thank you. Ms. Banzas. Good morning, may it please the court. Construing the evidence in a light most favorable to Ms. Banford, no reasonable jury could find that the decision by University of Minnesota Duluth, UMD, to relieve Ms. Banford of her part-time hockey operations director responsibilities was motivated by her sex. Well, let's assume Judge Schultz is wrong about the third factor, that this is just one job. Or at least there's a fact question about that. Because there's only one contract, right? There is one job appointment contract with dual positions, one from. And the HR director said you had to terminate her from both, you had to terminate the whole contract, terminate her from both jobs, right? So she was terminated from both jobs, that's undisputed as I understand it. Yes. So, and then they came back and re-offered her. So, okay, so she's terminated from both jobs. Does that, how does that affect the analysis? It doesn't. Your Honor. Assuming that she's terminated from both jobs, you get over the third factor. Right, there's no dispute that she suffered an adverse employment action when she was relieved of her hockey duties and the attendant $15,000.  She was relieved of all of her duties. Right, but if you review the record, along with that, she was non-renewed for that dual position, that hybrid position. And when they sought HR's advice, he says, and you know, how do I account for J.B., Jen Banford, not Jeanette Bazes, since she has two jobs at UMD, head softball coach and hockey operations for her non-renewal letter. I know it's one job appointment, but we want to take away the hockey component and keep her on an appointment as head softball coach. So they did exactly what HR instructed, which was to terminate this hybrid position and in a separate letter, in a separate meeting, then offer her the head coach job only position. But that was separated by a few weeks, right? Correct, it was about a month. So for a few weeks, she was terminated from all positions. Well, no, because her appointment was through June of 2015. So she still had that position. So in January, she was offered that position and told multiple times by Jay Finnerty, she testifies in her deposition that he kept telling her, we have 60 days, we have 60 days, we're working on the paperwork. Again, my question is, what difference does, let's assume we say she was terminated from everything. And that's the adverse employment action. What difference does it make? Well, it doesn't make a difference. It's not material, Your Honor, because what's really important is both her burden to meet element four, her burden to show pretext and her ultimate burden to show that there was discriminatory animus. And consistently and concurrently and contemporaneously, what was communicated to Ms. Miller, to Ms. Banford, to, and to everyone involved, there's immense and overwhelming evidence that they were told that they wanted to allow the new women's hockey head coach to be able to hire her own assistant coaches and her own director of hockey operations. Is that actually customary in Division I athletics? It seems to me that the director of hockey operations or the director of football operations or basketball operations in most Division I schools is a position that resides within the athletic department within the office of the director of athletics, right? And so that position doesn't report directly to the hockey coach. That position reports up the change through the assistant athletic director to the athletic director to whomever is ultimately in charge within that process. And what they're arguing essentially is this was a single personal services contract that within this personal services contract there were different obligations and some of those obligations were taken away and her pay was decreased. And that was done as a result of her gender or her sexual orientation. Now the argument goes, and I'd like to know why they're wrong on this, is that ordinarily athletic directors get to decide who they hire as the director of operations, not coaches. Coaches generally have control over the athletic staff. That would include the athletic trainers and the coaches, but does not have control over operations. Why is that not true? What's in the record, your honor, is the chancellor's and the athletic director's sworn testimony that it was custom and practice in Division I athletics for the coach to be able to choose their own director of operations. And her own position descriptions, Ms. Benford's own position descriptions indicate that she reported to Ms. Miller. Her own testimony indicates that she reported to Ms. Miller and I wrote this down so I could. What is the evidentiary background for that affidavit? I mean, did you present any evidence that when the University of Minnesota fired a head coach that this is what happened, or the University of Wisconsin, or University of Iowa, or North Dakota, or wherever? We submitted some media articles, your honor, because obviously we didn't have access to those decision makers. So we submitted some media articles, but really what's most important here is that their rationale was 100% consistent. It was contemporaneously communicated to Ms. Miller. It was communicated to Ms. Benford. And her own position description indicates that she did, in fact, report. In her own testimony, she stated that she was given roles and responsibilities from Ms. Miller. And when I said, did she direct your activities and you reported to her on your activities as hockey operations? And she said, with regard to women's hockey, I said, right. And she said, yes. So this is really a semantics argument. And frankly, to put this issue in context, and I should also mention that the new head women's hockey coach, who was a gay woman also, and who was recruited by the athletic director in early 2015, pursuant to her own declaration, she was, the position was made more attractive to her by her ability to choose her director of hockey operations as well as her two assistant coaches. And she testified that she did, in fact, hire her director of hockey operations, not just once, but twice. Counsel, is it relevant at all, or was it relevant to the decision at that time that Ms. Manford was in a romantic relationship with Ms. Miller? How does that play into our analysis, if at all? Well, first of all, there's zero evidence to support that allegation. The only evidence is that the reason to relieve her of her hockey duties was for the reasons we've just discussed. But the evidence actually contradicts it. The evidence is undisputed that Mr. Berlow learned that she was in a romantic relationship with Ms. Miller in 2013, soon after he arrived. He treated her remarkably, favorably, after that time period. He gave her outstanding performance reviews, reviews that were even higher than the reviews she gave herself. He gave her merit pay increases when he renewed her contract. He helped her get a green card to keep her at UMD. He not only wrote a letter for her, he got two prominent women in athletics, the head coach of Notre Dame's women's football team, as well as the NCAA director of gender initiatives to write a letter on her behalf. He appointed her to the athletics department's long-term strategic planning committee. He worked closely with her to create a field in the football stadium, Mulaski Field, to allow her softball team to play on campus for the first time in three years, because her field, as well as the men's field, the men's team also hadn't played on campus for three years, and secured $50,000 new budget money to enable that to happen. So there's absolutely zero evidence, and in fact, the evidence contradicts any notion that he had any animus against her, because she was in a relationship with Ms. Miller. I just want to point out that I think some of the most important overarching evidence, I may not have actually pointed out in my brief, so that from the very, very beginning in December, early December 2014, when this process of non-renewing the hockey ops position hadn't even begun yet, the athletic director wrote to Jay Finnerty in his office, who was sort of the HR liaison, and he wrote, he asked him to find out from human resources how we can retain Ms. Banford as head softball coach, but alleviate the duties of women's hockey, he wrote, at least until the new coaching staff is on board. He then invited her twice, once in his January 19th letter, after she had gone to the media, and he wrote a letter trying to clarify that you've got this all wrong, and also in the new offer letter, when he gave her the softball, I'm sorry, the softball coach offer, he again invited her to apply for the hockey operations position under the new coach. So that completely belies any discriminatory animus. He wanted her to stay at UMD. He thought she was an exceptional employee. I don't know if it makes a difference to the analysis, but she did not sign the contract, right? She did not, a couple weeks later, her lawyer wrote and declined it. I assume she did not apply with the new coach for the operations manager job. That's correct, that's correct. So, I think I didn't quite get to this point earlier. The notion as to whether or not Ms. Bamford reported to Ms. Miller is only relevant when we look at the issue of comparables. The comparables that plaintiff's counsel had pointed out were the other women who served the hockey program. The two assistant coaches, the strength and conditioning coach, the communications person, the athletic trainer. Her entire staff of six, Ms. Miller's entire staff of six were gay women. So they are not valid comparators because they share her protected characteristics as a gay woman. So the only real comparable Judge Schiltz found was the baseball coach, Bob Rents. So Bob Rents also was on a 12 month appointment. He had additional administrative duties, but he never got an augmentation as plaintiff concedes. And in fact, Ms. Bamford was the only person, the only coach on staff that got an augmentation to do her additional duties. And that had been arranged by Ms. Miller with the AD back in 2009 for that extra $10,000. But Mr. Rents, she was always treated more favorably than Mr. Rents, her closest comparator. She, as plaintiffs indicated in her briefs, prior to the non-renewal of Ms. Bamford's hockey operation duties, he was paid more than her. He, the offer that she received to be a softball coach, she was making $1,000 more than Mr. Rents. So she was always treated more favorably than Mr. Rents was. I wanted to point out that the Miller declaration doesn't, it wasn't, what she wrote was, the practice is customarily, it's a little bit tentative, limited to the elimination of the assistant coaches, this division one custom and practice. So she's a bit tentative about it. And she does concede that it's common practice with respect to assistant coaches to let them go and let the head coach go. But what Ms. Miller understood about division one custom and practice isn't relevant to Berlow's and Black's state of mind, to the athletic director's and the chancellor's state of mind, and what they understood D1 custom to be. And importantly, Mr. Berlow had been at two division one institutions prior to coming to UMD, whereas Ms. Miller, the only school at which she had ever served was UMD, which is a division three school, but with division one hockey. It's the only sports that are division one. But the important point here is, that as this court stated many times over, most recently I think in the Maine versus Ozark Health case, 959 F3rd 319, where Judge Erickson indicated that the proven employer's explanation was false. The employee must show that the employer truly did not believe it. And Ms. Banford simply cannot do. And Ms. Miller's own declaration, where she first makes this statement, of course this is years after the first round of discovery. This only came with round two of summary judgment. But she makes the point. She states, head coaches at a division one school hire their own director of operations, directly supervise them, and provide their performance review. So Judge Erickson, I think that's responsive to your question, that Ms. Miller's own declaration says that that's what occurs at D1 schools. And it's undisputed that this was a division one sport. I indicated that we submitted the articles. So I think overall, the notion that UMD used D1 common practice as a pretext to remove her from her director of hockey ops position, but fully intended to keep her a softball coach, offered her that job as a raise, extended multiple invitations to her to apply again for the hockey ops position. It simply doesn't raise a genuine issue of material facts about discriminatory animals. Thank you. Thank you very much. Ms. Van Dyke, I see you have 26 seconds left. I'll increase that to one minute. Thank you. I want to simply address a few things to make some clarifications and point you in the direction of the record. What really matters in terms of whether, what was the plan, what was in the head of Mr. Burlow, Mr. Blackwell, when they were, what's their rationale, the business reason for getting rid of the operations, the administrative, the part-time operations director in this division three school. The most, the best evidence is Mr. Burlow's own language to Jen Banford before he gave her the offer in January of 2015. When a head coach leaves her position, it is standard university practice to issue notices of non-renewal to the program's entire coaching staff. This allows the news head coach the opportunity to choose his, her staff. That clearly refers back to the coaching staff. There's no other way to interpret it, particularly since the other administrative women were left and not dismissed. Josh Burlow changed his tune after the litigation began. All of a sudden, it included operations. I want to point you to the contracts at the appendix, page 74, that's the three-year contract, says specifically in item number five, your performance, and this is for her whole job, will be reviewed annually by the director of intercollegiate athletics and the assistant director of the AD, AD and the assistant AD. Nothing about head coach. That's the contract. And the new contract, same thing. Why? Because her job description was always head coach. I believe your time has expired. Thank you very much. We'll take the matter at advisement. I want to thank you very much for the briefing and argument, it's been well done and well received. Thank you.